

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed August 20, 2024**

_____

**United States Bankruptcy Judge**

_____

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 (V) |
| | § | |
| KERWIN BURL STEPHENS, | § | Case No. 21-40817-elm-11 |
| | § | |
| THUNDERBIRD OIL & GAS, LLC, | § | Case No. 21-41010-elm-11 |
| | § | |
| THUNDERBIRD RESOURCES, LLC, | § | Case No. 21-41011-elm-11 |
| | § | |
| Debtors. | § | Jointly Administered Under |
| | § | Case No. 21-40817-elm-11 |
| | § | |
| TIBURON LAND AND CATTLE, LP and | § | |
| TREK RESOURCES, INC., | § | |
| | § | |
| Plaintiffs, | § | |
| v. | § | Adversary No. 21-04040 |
| | § | |
| KERWIN BURL STEPHENS, | § | |
| THUNDERBIRD OIL & GAS, LLC, and | § | |
| THUNDERBIRD RESOURCES, LLC, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION

Pending before the Court in this adversary proceeding are the following post-appellate

motions originally filed by the parties in Cause No. DC-2013-00016 (the **"State Court Action"**)

in the 32nd Judicial District Court of Fisher County, Texas (the "**State Court**") prior to the removal of the parties' claims and causes of action from the State Court Action to this Court: (1) the *Plaintiffs' Post-Remand Motion for Entry of Judgment* (the "**Plaintiffs' Motion for Judgment**") filed by Plaintiffs Tiburon Land and Cattle, LP ("**Tiburon**") and Trek Resources, Inc. ("**Trek**" and together with Tiburon, the "**Plaintiffs**");[1] and (2) the *Thunderbird Defendants' Motion for Judgment Non Obstante Veredicto and to Disregard Jury Findings Related to Plaintiffs' Claims* (the "**Defendants' JNOV Motion**" and together with the Plaintiffs' Motion for Judgment, the "**Post-Appellate Motions**") filed by Defendants Kerwin Burl Stephens ("**Stephens**"), Thunderbird Oil & Gas, LLC ("**Thunderbird Oil**"), and Thunderbird Resources, LLC ("**Thunderbird Resources**" and together with Stephens and Thunderbird Oil, the "**Defendants**").[2]

## INTRODUCTION

The Post-Appellate Motions relate to an August 2015 jury verdict reached in the State Court Action at the conclusion of a three-week trial.  Following the Plaintiffs' election to obtain judgment solely on the claims and causes of action pursued in the name of Three Finger Black Shale Group ("**Three Finger**") – an alleged co-plaintiff partnership in which the Plaintiffs claimed to be partners and on whose behalf they purported to act – the State Court entered a Final Judgment in favor of Three Finger.[3]  The Defendants (and others) then appealed.

---

[1] State Court Clerk's Record (as hereafter defined), Docket No. 48-2 (Plaintiffs' Motion for Judgment).

[2] State Court Clerk's Record (as hereafter defined), Docket No. 48-4 (Defendants' JNOV Motion).  The "Thunderbird Defendants" include additional parties who are not party to this adversary proceeding.  Consequently, the Court's consideration of the Defendants' JNOV Motion is limited to the relief sought by the Defendants alone.  With respect to all other non-party Thunderbird Defendants, the Defendants' JNOV Motion was effectively either remanded to the State Court in connection with the remand of claims and causes of action asserted by or against parties other than the Defendants or was never removed to the extent the relief sought relates to claims or causes of action asserted by or against parties other than the Defendants that were not removed to this Court.

[3] *See* State Court Clerk's Record (as hereafter defined), Docket No. 50-34, at pp. 109-118 (the "**Final Judgment**").  The Final Judgment also provided relief to the Intervenors (as hereafter defined).  For purposes of this Memorandum Opinion, however, all references to the Final Judgment will solely be in reference to the portion of the Final Judgment granting relief to Three Finger.

In June 2019, the Eleventh Court of Appeals at Eastland, Texas (the "**Texas Appellate Court**") issued its ruling, reversing the Final Judgment and rendering judgment that Three Finger take nothing based upon the court's determination that the Plaintiffs had failed to present legally sufficient evidence to support the jury's determination that Three Finger existed as a validly established partnership.[4]  Because the jury had also made findings in relation to the Plaintiffs' individual claims and causes of action and the Plaintiffs reserved the right to seek judgment on such claims and causes of action in the event of a reversal, the Texas Appellate Court ordered the case to be remanded to the State Court to give the Plaintiffs an opportunity to request judgment on their claims and causes of action.[5]

Prior to remand, further review was sought from the Texas Supreme Court.  On August 28, 2020, the Texas Supreme Court denied the petitions for review and on March 5, 2021, denied the parties' motions for rehearing.  Thus, on March 10, 2021, the Texas Appellate Court issued its mandate, remanding the case back to the State Court for further proceedings.[6]  Thereafter, the parties filed the Post-Appellate Motions.

On April 7, 2021, prior to the State Court's determination of the Post-Appellate Motions, Stephens filed a voluntary petition for relief under chapter 11 (subchapter V) of the Bankruptcy Code with this Court, thereby initiating Case No. 21-40817.  Thereafter, on April 28, 2021, each of Thunderbird Oil and Thunderbird Resources also filed a voluntary petition for relief under chapter 11 (subchapter V) of the Bankruptcy Code, thereby initiating Case Nos. 21-41010 and 21-41011, respectively.  The Court then ordered all three bankruptcy cases to be jointly administered

---

[4] *See Stephens v. Three Finger Black Shale P'ship*, 580 S.W.3d 687 (Tex. App. – Eastland 2019, pet. denied).

[5] *See id*. at 732.

[6] *See Tiburon Land & Cattle, LP v. Stephens (In re Stephens)*, 639 B.R. 679, 685 (Bankr. N.D. Tex. 2022).

under Case No. 21-40817. The bankruptcy filings had the effect of staying all further state court proceedings.

On July 6, 2021, the Defendants jointly filed a *Notice of Removal* pursuant to 28 U.S.C. § 1452[7] to remove all claims and causes of action asserted by the Plaintiffs against the Defendants in the State Court Action to this Court. The removal initiated this adversary proceeding and had the effect of removing the Post-Appellate Motions to this Court as well. Following certain preliminary hearings in the adversary proceeding, the parties filed their respective supplemental briefs, appendices, and other documents in relation to the Post-Appellate Motions,[8] and on July 21, 2022, the Court conducted a hearing on the motions.

Having now considered the Post-Appellate Motions, the parties' respective responses, replies, and supplemental filings in relation thereto,[9] the representations and arguments of counsel, the Plaintiffs' Final Petition (as hereafter defined), the Defendants' Answer (as hereafter defined), the Jury Verdict, the State Court Clerk's Record,[10] and the State Court Trial Record,[11] the Court finds for the reasons set forth herein that the Plaintiffs' Motion for Judgment should be denied, that the Defendants' JNOV Motion should be granted in part, and denied in part, and that judgment should be rendered that the Plaintiffs take nothing from the Defendants in this action.

---

[7] *See* 28 U.S.C. § 1452(a) (permitting removal of claims and causes of action in a civil action to a district court if the district court has jurisdiction of the claims and causes of action under the bankruptcy jurisdictional provisions of 28 U.S.C. § 1334).

[8] Prior to removal, the Defendants filed a response in opposition to the Plaintiffs' Motion for Judgment in the State Court Action which is also considered part of the removal record. *See* State Court Clerk's Record (as hereafter defined), Docket No. 48-3.

[9] *See* Docket Nos. 48-3, 52, 53, 54, 57, 58, 62, 63, 64, 68, 69, 70 and 73.

[10] *See* Docket Nos. 48 and 50 (collectively, the "**State Court Clerk's Record**").

[11] *See* Docket Nos. 41, 47 and 49 (collectively, the "**State Court Trial Record**").

## *JURISDICTION*

The Court has jurisdiction of this adversary proceeding, including the Post-Appellate Motions, pursuant to 28 U.S.C. §§ 1334 and 157 and *Miscellaneous Order No. 33: Order of Reference of Bankruptcy Cases and Proceedings Nunc Pro Tunc* (N.D. Tex. Aug. 3, 1984). Venue of the adversary proceeding in the Northern District of Texas is proper under 28 U.S.C. § 1409. The adversary proceeding is core in nature pursuant to 28 U.S.C. § 157(b)(2)(B).[12]

## *FACTUAL BACKGROUND*

Before turning to the relief requested by the parties pursuant to the Post-Appellate Motions, it is helpful for frame of reference and context to set out certain of the uncontested facts in this case.[13]

### A.    *The Fisher County Oil and Gas Opportunity*

The events leading up to the dispute between the parties go back to 2011 when Richard Raughton ("**Raughton**") became aware of a growing interest in oil and gas interests located in the Three Finger/Black Shale Formation of Fisher County, Texas (the "**Prospect**"). Raughton, the holder of a degree in geology with a concentration in engineering, had previously conducted geological studies within the Prospect. Raughton sought to leverage the information that he had obtained from the studies in a way that he could profit from the developing oil and gas play. Lacking sufficient resources of his own to fully capitalize on the opportunity, he reached out to friends and business contacts to invite them to participate in the project.

---

[12] The Courts notes that the Plaintiffs have filed proofs of claim in the Defendants' bankruptcy cases to assert claims against the Defendants based upon the claims and causes of action pursued in the State Court Action and the jury's verdict.

[13] *See also Stephens*, 580 S.W.3d at 697-700.

Among the individuals contacted by Raughton were Chester Carroll ("**Carroll**"), Lowry Hunt ("**Hunt**"), and Stephens, each of whom had a personal or business connection to Raughton and had experience in oil and gas investing.  Ultimately, they all agreed to participate in the investment opportunity and each of them pledged to invest $125,000 to get the project off the ground.  Thereafter, certain oil and gas leases and options were acquired.

### B.    *The Alpine Letter Agreement*

By October 2011, additional capital was needed to move the project forward.  At that point, Carroll successfully recruited Tom Taylor ("**Taylor**"), another regular oil and gas investor.  For purposes of memorializing a go-forward agreement, each of the individuals other than Carroll elected to use a separately organized entity: Raughton used Arapaho Energy, LLC ("**Arapaho**"); Hunt used L.W. Hunt Resources, LLC ("**Hunt Resources**"); Stephens used Thunderbird Oil; and Taylor used Paradigm Petroleum Corporation ("**Paradigm**").  In Carroll's case, he elected to move forward in his individual capacity, using the name Alpine Petroleum ("**Alpine**").

On or about October 18, 2011, Carroll d/b/a Alpine, Thunderbird Oil, Arapaho and Hunt Resources (collectively, the "**Alpine Group**") entered into a letter agreement with Paradigm, dated October 7, 2011, to memorialize their agreement with respect to the acquisition of oil and gas leases in the Prospect.  Because the letter agreement was prepared on Alpine letterhead, it became known as the "**Alpine Letter Agreement**."[14]  Paradigm acknowledged in the Alpine Letter Agreement that the Alpine Group had already acquired certain oil and gas leases and options in the Prospect listed or otherwise described on Exhibits A, B and C to the agreement (collectively, the "**Alpine Group Interests**").[15]  Pursuant to the Alpine Letter Agreement, the Alpine Group

---

[14] *See* State Court Trial Record, Plaintiffs' Trial Exh. 6 (Alpine Letter Agreement).

[15] Alpine Letter Agreement ¶ 1.

members agreed to both contribute the Alpine Group Interests to the project and to spend (or to

have spent) a total of $500,000 on option fees, landman expenses, filing fees, bonus payments and

out of pocket expenses for the acquisition of oil and gas leases and option agreements before

Paradigm was required to provide any funding.[16]  Subject to such condition, Paradigm agreed to

provide funding of at least $4.5 million to complete the lease acquisition project.[17]

Going forward, all of the oil and gas leases and options acquired, including the Alpine

Group Interests, would be held in Paradigm's name, Paradigm would have control over the

approval of future acquisitions and sales, and Paradigm would have control over the overall scope

of the project.[18]  The parties also agreed that Thunderbird Land Services, LLC ("**Thunderbird**

**Land**"), a separate Stephens company, would be engaged to provide landman services for the

project at its normal, customary rates.[19]  With respect to the eventual sale to third parties of the oil

and gas interests acquired, the Alpine Letter Agreement detailed how the net sales proceeds would

be divided among the parties.[20]  Importantly, under the terms of the Alpine Letter Agreement, the

parties agreed that they had not entered into, and were not entering into, any partnership, joint

venture or agency relationship, and that none of the parties owed a fiduciary duty or obligation to

any other party.[21]

## C.    *The Participation Agreement*

Taylor separately recruited a different set of investors to enable his company, Paradigm, to

fulfill its financial commitment under the Alpine Letter Agreement.  Paradigm and this separate

---

[16] *Id*. ¶¶ 1-2.

[17] *Id*. ¶ 3.

[18] *Id*. ¶¶ 1, 3 and 7.

[19] *Id*. ¶ 4.

[20] *Id*. ¶¶ 8-9.

[21] *Id*. ¶ 6.

Case 21-04040-elm    Doc 78    Filed 08/20/24    Entered 08/20/24 11:33:08    Desc Main
Document    Page 8 of 40

group of investors (collectively, the "**Participation Agreement Investors**") entered into a Participation Agreement, dated effective October 18, 2011 (the "**Initial Participation Agreement**"), to memorialize their agreement.[22]  Tiburon and Trek were among the Participation Agreement Investors.

Pursuant to the Initial Participation Agreement, Paradigm represented that it had acquired or would acquire oil, gas and mineral leases within the Prospect ultimately comprising a total of approximately 25,000 mineral acres in Fisher County, Texas.[23]  With that in mind, Paradigm provided an opportunity to each of the Participation Agreement Investors to participate in the acquisition project for a contribution of $500,000 each.[24]  Paradigm, as a co-investor, agreed to contribute $1,000,000 towards the project.[25]  The parties memorialized their objective of having the leases acquired and then sold to a third party for a profit, detailing how the net sales proceeds would be divided.[26]

Under the terms of the Participation Agreement, the parties also designated an area of mutual interest within the Prospect (the "**AMI**"), agreeing that for a period of five years from the date of the agreement, should any party (including Paradigm) acquire or enter into a contract to acquire any oil and gas rights and/or mineral interests or leasehold interests in minerals within a one mile radius of any of the leases owned by the parties within the Prospect, the acquiring party would be required to offer to the non-acquiring parties the right to participate in the acquisition on the same terms and conditions applicable to the acquiring party.[27]

---

[22] *See* State Court Trial Record, Plaintiffs' Trial Exh. 5 (Initial Participation Agreement).

[23] Initial Participation Agreement ¶ 1.

[24] *Id*. ¶ 4.

[25] *Id.*

[26] *Id*. ¶ 3.

[27] *Id*. ¶ 2.

Following execution of the Initial Participation Agreement, certain of the Participation Agreement Investors elected to use a separately organized entity to invest in the project and one of the initial Participation Agreement Investors dropped out.  Additionally, the remaining parties, including Paradigm, agreed to increase their investment levels – Paradigm by $200,000 and the remaining Participation Agreement Investors by $100,000 each.  These changes were memorialized in a First Addendum to the Initial Participation Agreement, dated December 27, 2011.[28]

**D.      *The Devon Agreement and Pre-Closing Modifications to the Alpine Letter Agreement and Participation Agreement***

Ultimately, the Fisher County acquisition project proved to be successful.  In January 2012, Devon Energy Production Company, L.P. ("**Devon**") entered into a Purchase and Sale Agreement with Paradigm pursuant to which Devon agreed to purchase approximately 25,000 mineral acres of oil and gas leases (the "**Devon Agreement**").[29]  The agreement was later amended to increase the acreage to approximately 30,000 mineral acres (the "**Initial 30,000 Acres**") for $25 million, subject to adjustments.

Under the terms of the Devon Agreement, Devon was also granted an option to purchase any additional Fisher County oil and gas acreage thereafter acquired by or on behalf of Paradigm or any "Seller's Affiliate" (as defined in the agreement) through March 12, 2013, on the same terms and conditions.[30]  And during the same period, Devon agreed that it would not directly or indirectly purchase or attempt to purchase any oil and gas leases within the option area.[31]

---

[28] *See* State Court Trial Record, Plaintiff's Trial Exh. 11 (First Addendum to Initial Participation Agreement).

[29] See State Court Trial Record, Plaintiff's Trial Exh. 15 (Devon Agreement).

[30] *See* Devon Agreement ¶ 10(a).

[31] *See id.* ¶ 10(f).

The Devon Agreement contemplated a closing on the Initial 30,000 Acres by March 12, 2012.[32]  Leading up to the closing, additional modifications were made to the Alpine Letter Agreement and Participation Agreement.  First, in relation to the Alpine Letter Agreement, on March 5, 2012, Stephens sent a letter to the other members of the Alpine Group indicating that he (Thunderbird Oil and Thunderbird Land) would no longer participate in the project in the absence of a reconfiguration of the sharing of interests/profits among the members of the Alpine Group.[33]  Thereafter, on or about March 11, 2012, the Alpine Group members agreed to the terms of a reconfiguration of interest/profits.[34]  This would later be the subject of a dispute among the members of the Alpine Group.

Next, several changes were made to the Initial Participation Agreement.  First, Taylor opted to replace Paradigm with Lazy T Royalty Management, Ltd. ("**Lazy T**"), such that Lazy T would now be the investment party required to fund the contributions previously required of Paradigm.  In the case of Paradigm, it would continue to be responsible for acquiring and thereafter selling the oil, gas and mineral leases contemplated by the agreement "as agent" for the parties.  Second, additional changes were made by the Participation Agreement Investors with respect to how they would participate in the project (*e.g.*, whether individually or through a separately organized entity).  Finally, the Alpine Group was included within the listing of Participation Agreement Investors in the body of the agreement.  Whether the Alpine Group, or any individual member(s)

---

[32] *See id*. ¶ 1.

[33] *See* State Court Trial Record, Plaintiff's Trial Exh. 25.

[34] *See* State Court Trial Record, Plaintiff's Trial Exh. 29.

of the Alpine Group, actually agreed to become a party to the agreement, however, would later become a disputed issue.[35]

To address the foregoing changes, on or about March 16, 2012, the Initial Participation Agreement was replaced with a restated Participation Agreement, dated effective October 18, 2011, and the First Addendum to the Initial Participation Agreement was replaced with a restated First Addendum to the restated Participation Agreement, dated December 27, 2011 (the restated Participation Agreement and restated First Addendum collectively referred to as the "**Participation Agreement**").[36]

Ultimately, the transaction involving the Initial 30,000 Acres closed and disbursements were made to the Participation Agreement Investors in relation to the Participation Agreement, to members of the Alpine Group in relation to the Alpine Letter Agreement, and to Lazy T/Paradigm in relation to both agreements.  Certain amounts were also paid to Thunderbird Land on account of its landman services and expenses.

The Plaintiffs would later take issue with whether Lazy T had fully funded its committed contributions under the Participation Agreement, whether Thunderbird Land had overcharged for certain expenses, and whether the Plaintiffs had received the full amount of their share of profits under the terms of the Participation Agreement.

**E.**    *The Additional Acreage Transaction*

Separately, at or around the time of the closing of the Initial 30,000 Acres, Devon personnel informed Taylor that Devon was interested in acquiring additional acreage within the Prospect.

---

[35] Among other things, the restated agreement did not include a signature line for the "Alpine Group" or for Arapaho, Hunt Resources, or Thunderbird Oil.  It only included a signature line for "Alpine Petroleum" – the business name used by Carroll.

[36] *See* State Court Trial Record, Plaintiff's Trial Exhs. 33 and 34 (Participation Agreement).

Taylor informed, among others, Carroll and Stephens.  Among the disputed issues later presented

to the jury for determination was whether, in conjunction therewith, Taylor told Carroll and

Stephens that the Participation Agreement Investors had no interest in continuing with the project

and whether Carroll and Stephens had a good faith belief that the Participation Agreement had

been terminated.  In the latter case, following the closing of the Initial 30,000 Acres, Taylor

circulated a proposed Termination of Participation Agreement, to be effective June 1, 2012, to

each of the Participation Agreement Investors.  While it appears that most of the Participation

Agreement Investors executed the agreement, Tiburon and Trek did not.

Ultimately, Taylor, Carroll and Stephens, by and through their respective entities,

collaborated on the acquisition of additional oil and gas leases and options within the Prospect (the

"**Additional Acreage**") and Paradigm sold the Additional Acreage to Devon.  None of the

proceeds were distributed to the Plaintiffs.  The Plaintiffs would later take issue with their

exclusion from the acquisition and sale of the Additional Acreage.

## F.    *The State Court Action*

On July 10, 2013, Tiburon initiated the State Court Action with the filing of its original

petition against Taylor, Lazy T, the general partner of Lazy T, Paradigm, and the Alpine Group.[37]

Thereafter, Trek and Three Finger were added as plaintiff parties (together with Tiburon, the

"**State Court Plaintiff Parties**") and Carroll, Stephens, Thunderbird Oil, Thunderbird Resources,

Thunderbird Land, and Stephens & Myers, LLP ("**Stephens & Myers**") (Stephens' law firm),

among others, were added as defendant parties.[38]  Raughton and Hunt Resources (collectively, the

---

[37] *See* State Court Clerk's Record, Docket No. 50-1, at pp.12-21 (Plaintiff's Original Petition).

[38] *See, e.g.*, State Court Clerks' Record, Docket No. 50-1, at pp.129-164 (Plaintiffs' Sixth Amended Petition).

"**Intervenors**") also intervened as plaintiff-side parties to assert a variety of claims in relation to the Alpine Letter Agreement.[39]

On March 4, 2015, the State Court Plaintiff Parties filed their final Seventh Amended Petition (hereafter, the "**Final Petition**").[40]  Pursuant to the Final Petition, the State Court Plaintiff Parties asserted the following causes of action against the defendant parties, including (as applicable) the Defendants: breach of contract (for failure to make required contributions, for failure to properly distribute sales proceeds from the sale of the Initial 30,000 Acres, and for breach of the AMI provision of the Participation Agreement); breach of fiduciary duty; fraud; money had and received/unjust enrichment; and fraudulent transfers.  Additionally, the State Court Plaintiff Parties asserted a right to recover under the derivative liability claims of civil conspiracy and concert of action and requested, among other relief, an award of exemplary damages and the disgorgement of profits.  The Defendants filed a general denial as to all claims, causes of actions, and requests for relief ("**Defendants' Answer**").[41]

The case was set for trial in late July 2015.  Just prior to trial, on or about July 25, 2015, the State Court Plaintiff Parties and Intervenors settled with Lazy T, Paradigm, the estate of Taylor,[42] and certain other Taylor-affiliated parties, and the settling parties entered into a Compromise Settlement Agreement with Mutual Releases and Covenant Not to Sue, effective July 27, 2015 (the "**Taylor Party Settlement**").[43]  Under the terms of the Taylor Party Settlement, the Taylor-affiliated parties, including Lazy T and Paradigm, agreed to pay $3.7 million to the State

---

[39] *See, e.g.*, State Court Clerk's Record, Docket No. 50-1, at pp.165-205 (Fourth Amended Petition in Intervention).

[40] State Court Clerk's Record, Docket No. 50-2, at pp. 4-40 (Final Petition).

[41] *See* State Court Clerk's Record, Docket No. 50-1, at pp.66-80 (Defendants' Answer).

[42] Subsequent to initiation of the State Court Action, but prior to trial, Taylor passed away and an executrix of his estate was appointed.

[43] *See* State Court Clerk's Record, Docket No. 50-32, at pp.11-69 (Taylor Party Settlement Agreement).

Court Plaintiff Parties, to be allocated as follows: $925,000 for actual damages, and $925,000 for exemplary damages, on account of claims involving the Initial 30,000 Acres (the co-called "**Group 1 Claims**"); and $925,000 for actual damages, and $925,000 for exemplary damages, on account of claims involving the Additional Acreage (the so-called "**Group 2 Claims**").[44]   On July 27, 2015, the State Court entered an order dismissing all of the State Court Plaintiff Parties' and Intervenors' claims against the Taylor-affiliated parties with prejudice based upon the Taylor Party Settlement.[45]   On the same date, the Thunderbird Defendants, including the Defendants and Thunderbird Land, filed an Election of Settlement Credit pursuant to section 33.012 of the Texas Civil Practice & Remedies Code based upon the Taylor Party Settlement.[46]

The next day, July 28, 2015, the jury trial commenced.  At the conclusion of a three-week trial, the State Court conducted a charge conference to finalize the jury charge and verdict form. In connection therewith, certain claims and causes of action, or aspects of claims and causes of action, from the Final Petition were narrowed or abandoned, and certain other refinements were made.  Ultimately, inclusive of the questions presented with respect to the Intervenors' claims and causes of action against the remaining defendant parties, the jury was given a 69-page jury charge with 54 questions.  On August 19, 2015, the jury returned its verdict (the "**Jury Verdict**").[47]

Based upon the Jury Verdict, the State Court Plaintiff Parties elected to request judgment only on the claims and causes of action asserted by Three Finger.  Thereafter, on March 30, 2016, the State Court entered the Final Judgment pursuant to which, among other things, in excess of $4.5 million in compensatory damages were awarded to Three Finger against each of Thunderbird

---

[44] *See* Taylor Party Settlement Agreement ¶¶ 3(a) and 6.

[45] *See* State Court Clerk's Record, Docket No. 50-27, at pp.138-141.

[46] *See* State Court Trial Record, Docket No. 20-27, at pp.134-137.

[47] *See* State Court Clerk's Record, Docket No. 50-28, at pp. 93-161 (Jury Verdict).

Oil and Thunderbird Resources and in excess of $18.4 million in compensatory and punitive damages were awarded to Three Finger against Stephens, in each case exclusive of prejudgment interest and costs.[48]

## G.      Appeal of the Final Judgment

The Defendants (and others) lodged a timely appeal from the Final Judgment.  On June 28, 2019, the Texas Appellate Court issued its ruling in resolution of the appeal (the "**Appellate Ruling**").[49]  In relation to Three Finger's claims against the Defendants, the Texas Appellate Court determined that the State Court Plaintiff Parties had failed to present legally sufficient evidence of Three Finger's existence as a validly established partnership and, therefore, reversed the judgment in relation to Three Finger and rendered judgment that Three Finger take nothing against the Defendants.[50]  Additionally, to the extent that certain of the claims and causes of action asserted against the Defendants were dependent upon the jury's conclusion that the Alpine Group constituted a partnership, the Texas Appellate Court reversed such determination, finding that the members of the Alpine Group had validly disclaimed any partner-related fiduciary duties to one another under the terms of the Alpine Letter Agreement and that, in relation to the period of time preceding execution of the Alpine Letter Agreement, the plaintiff-side parties had failed to present legally sufficient evidence at trial to support a finding that the Alpine Group ever existed as a validly established partnership.[51]

Because the Final Judgment did not dispose of any of the Plaintiffs' individual claims and causes of action, however, the Texas Appellate Court instructed the case to be remanded to the

---

[48] *See* State Court Clerk's Record, Docket No. 50-34, at pp. 109-118 (Final Judgment).  The Final Judgment also awarded damages to the Intervenors against the Defendants (and others).

[49] *See Stephens*, 580 S.W.3d at 687.

[50] *See id*. at 714.

[51] *See id*. at 715-17.

State Court "so that Trek and Tiburon may make an election to recover based upon other jury findings in favor of Trek and Tiburon and upon which alternative theories [the Texas Appellate Court] has not had an opportunity to rule."[52]    While petitions for further review by the Texas Supreme Court were filed by multiple parties, the Texas Supreme Court denied the petitions on August 28, 2020, and on March 5, 2021, denied the parties' respective motions for rehearing. Consequently, on March 10, 2021, the Texas Appellate Court issued its mandate remanding the case to the State Court for further proceedings.[53]

**H.**    ***The Post-Appellate Motions and Removal of the Plaintiffs'***
***Claims and Causes of Action Against the Defendants***

Thereafter, the Plaintiffs filed the Plaintiffs' Motion for Judgment and the Defendants filed the Defendants' JNOV Motion.  As indicated above, prior to the State Court's determination of the Post-Appellate Motions, the Defendants filed for bankruptcy protection and the Post-Appellate Motions were removed to this Court in connection with the removal of Plaintiffs' claims and causes of action against the Defendants.

### *DISCUSSION*

The jury made three different sets of individualized damages determinations in favor of Tiburon and Trek within the Jury Verdict.  Two of them relate to the breach of fiduciary duty cause of action asserted by the Plaintiffs within the Final Petition.  Relying upon those determinations and the jury's associated conspiracy and concert of action findings in certain circumstances, the Plaintiffs, on remand, request the entry of a judgment against the Defendants that awards the

---

[52] *See id*. at 732.

[53] *See Stephens*, 639 B.R. at 684-85.

Case 21-04040-elm    Doc 78    Filed 08/20/24    Entered 08/20/24 11:33:08    Desc Main
Document    Page 17 of 40

Plaintiffs the individualized damages determined by the jury in their favor, plus additional exemplary damages found by the jury to be awardable against Stephens.[54]

The Defendants oppose the motion, asserting that a new judgment cannot be fashioned in favor of the Plaintiffs by simply relying upon the existence of individualized damages determinations. Among other things, based upon the reasons for reversal of the Final Judgment, as articulated by the Texas Appellate Court, the Defendants assert that the Plaintiffs have failed in certain circumstances, as a matter of law, to establish their breach of fiduciary duty claims against certain of the targeted State Court defendants, including the Defendants. In relation to the Plaintiffs' conspiracy and concert of action claims, the Defendants assert that without the establishment of predicate liability and recoverable damages, the Defendants cannot independently be held liable for the damages determinations made by the jury. Additionally, with respect to any damages that the Court may find to be awardable to the Plaintiffs, the Defendants assert that they are entitled to a settlement credit on account of the Taylor Party Settlement.

Separately, pursuant to the Defendants' JNOV Motion, the Defendants argue that certain of the jury's determinations must be disregarded, either for either lack of relevance to the particular claim at issue or for lack of legally sufficient evidence to support them. Unsurprisingly, the Plaintiffs oppose the Defendants' motion, arguing that all of the findings are relevant and are supported by legally sufficient evidence.

---

[54] Importantly, while the jury was presented with questions relating to other claims and causes of action, and the Plaintiffs originally requested equitable disgorgement relief pursuant to Plaintiffs' Motion for Judgment, the Plaintiffs have made it clear that they are not seeking, or are no longer seeking (as applicable), judgment on any of those other claims and causes of action or bases for relief. *See* Docket No. 64, ¶ 9 ("Plaintiffs do not seek judgment based on any of the following: disgorgement or equity claims (Q21, Q22); breach of contract (Q24, Q25); tortious interference with contract and related defenses (Q15, Q16); and any claims stemming from the Jury's finding that Three Finger Black Shale is a partnership (Q1)." Consequently, the Court hereby treats such claims, causes of action, and requests for relief as voluntarily waived and abandoned by the Plaintiffs and they will not be discussed further herein.

In evaluating the parties' arguments, the Court notes that neither of the motions is to "be decided by which side has the better of the case … it is the function of the jury as the traditional finder of the facts, and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses."[55]   Under Texas law, a court may render judgment *non obstante veredicto* only if a directed verdict would have been proper.[56]   And in the case of a plaintiff's claim, a directed verdict is only properly granted where (a) the plaintiff cannot establish the elements of the claim as a matter of law,[57] (b) the plaintiff has failed to present evidence on one or more of the elements essential to the claim,[58] (c) the evidence conclusively establishes a defense to the claim,[59] or (d) the facts and inferences on a critical element of the claim point so strongly and overwhelmingly in favor of the defendant that reasonable people could not arrive at a contrary verdict.[60]

In considering whether to override the jury's determination of an issue, a complete absence of probative facts is not necessary; rather, "[t]here must [have] be[en] a conflict in substantial evidence to create a jury question" in the first place.[61]   "Substantial evidence" requires more than a mere scintilla of evidence; it requires that level of evidence that would enable reasonable and

---

[55] *Boeing Co. v. Shipman*, 411 F.2d 365, 374-75 (5th Cir. 1969), *overruled on other grounds by Gautreaux v. Scurlock Marine, Inc*., 107 F.3d 331 (5th Cir. 1997).

[56] *See* Tex. R. Civ. P. 301; *Fort Bend County Drainage Dist. v. Sbrusch*, 818 S.W.2d 392, 394 (Tex. 1991).

[57] *See Tana Oil & Gas Corp. v. McCall*, 104 S.W.3d 80, 82 (Tex. 2003).

[58] *See, e.g., Jolley v. Welch*, 904 F.2d 988, 993 (5th Cir. 1990), *cert. denied*, 498 U.S. 1050 (1991); *Axcess Int'l, Inc. v. Baker Botts, LLP*, No. 05-14-01151-CV, 2016 WL 1162208, at *4 (Tex. App. – Dallas Mar. 24, 2016, pet. denied).

[59] *See, e.g., Horak v. Pullman, Inc*., 764 F.2d 1092, 1096 (5th Cir. 1985); *Synergy Mgmt. Group, LLC v. Thompson*, 398 S.W.3d 843, 845 (Tex. App. – Eastland 2012, no pet.).

[60] *See, e.g., Murphy v. Texas Kenworth Co*., 615 F.2d 655, 656 (5th Cir. 1980) (quoting *Boeing*, 411 F.2d at 374); *Vela v. Sherman-Vela*, No. 02-22-00045-CV, 2023 WL 4243478, at *4 (Tex. App. – Fort Worth June 29, 2023, no pet.).

[61] *See Boeing*, 411 F.2d at 375.

fair-minded people to differ in their conclusions.[62]  "Less than a scintilla of evidence exists when the evidence is so weak as to do no more than create a mere surmise or suspicion of a fact."[63]

A.    *The Group 1 Claims Involving the Acquisition and Sale of the Initial 30,000 Acres*

While in the Final Petition the Plaintiffs included each of the Defendants as a direct target of the Plaintiffs' breach of fiduciary duty claim with respect to the acquisition and sale of the Initial 30,000 Acres, the jury was not asked to determine whether any of the Defendants breached a fiduciary duty to the Defendants.[64]  Instead, the jury was only asked to determine whether Lazy T, Paradigm, and Thunderbird Land breached their alleged fiduciary duties to the Plaintiffs.  In the case of the Defendants, the Plaintiffs seek to hold them liable under the derivative claims of concert of action and conspiracy, predicated upon the breach of fiduciary duty determinations made by the jury in relation to Lazy T, Paradigm, and Thunderbird Land.

Thus, before considering the jury's findings with respect to concert of action and conspiracy, it is first necessary to consider the jury's findings in relation to breach of fiduciary duty against Lazy T, Paradigm, and Thunderbird Land.  To succeed on a claim for breach of fiduciary duty under Texas law, the following elements must be satisfied: (1) the existence of a fiduciary duty, (2) breach of the duty, (3) causation, and (4) damages.[65]

---

[62] *See Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997), *cert. denied*, 523 U.S. 1119 (1998).

[63] *Stephens*, 580 S.W.3d at 709 (citing *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003), *cert. denied*, 541 U.S. 1030 (2004)).

[64] The failure to submit questions to the jury on the Defendants' alleged breach of fiduciary duty constituted a waiver of such claim against the Defendants.  *See Cosgrove v. Grimes*, 774 S.W.2d 662, 666 (Tex. 1989).

[65] *First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 220 (Tex. 2017).

### 1.    The Alleged Fiduciary Duties Owed to the Plaintiffs

Texas law is well settled that "not every relationship involving a high degree of trust and confidence rises to the stature of a fiduciary relationship."[66]  Simply being a party to an investment agreement, for example, does not bind one to a fiduciary duty in favor of other parties to the agreement.   Ordinarily, if a fiduciary relationship is intended by the parties, the parties must expressly say as much within their agreement.

That said, certain types of relationships will cause a fiduciary duty to arise as a matter of law.   As relevant to this case, for example, both partnership and agency relationships cause a fiduciary duty to arise as a matter of law.[67]  Otherwise, while an informal fiduciary duty may be found to exist from a "moral, social, domestic or purely personal relationship of trust and confidence,"[68] it is not recognized lightly, and in the context of a contractual relationship requires the existence of a special relationship of trust and confidence prior to, and apart from, the contractual relationship.[69]

With the foregoing in mind, the jury was presented with a series of predicate questions designed to establish a factual basis for the existence of a fiduciary duty owed to the Plaintiffs. These questions, the jury's responses thereto, and the impact of the Appellate Ruling are considered in relation to each of Lazy T, Paradigm, and Thunderbird Land.

<u>Fiduciary Duty Allegedly Owed by Lazy T to the Plaintiffs</u>.  First, pursuant to Question 1, the jury was asked to determine whether Three Finger was a partnership.  An answer of "yes"

---

[66] *Meyer v. Cathey*, 167 S.W.3d 327, 330 (Tex. 2005) (quoting *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 176-77 (Tex. 1997)).

[67] *See National Plan Adm'rs, Inc. v. National Health Ins. Co*., 235 S.W.3d 695, 700 (Tex. 2007); *Johnson v. Brewer & Pritchard, P.C*., 73 S.W.3d 193, 199 (Tex. 2002).

[68] *See Associated Indem. Corp. v. CAT Contracting, Inc*., 964 S.W.2d 276, 287 (Tex. 1998).

[69] *See Meyer*, 167 S.W.3d at 331.

would mean that all of the parties to the Participation Agreement, including Lazy T, would owe a fiduciary duty to one another in connection with the Participation Agreement as partners. While the jury did, in fact, answer "yes" to the question, because the Texas Appellate Court determined that Three Finger did *not* constitute a validly established partnership, the jury's answer to Question 1 must be disregarded. And because no other predicate question with respect to the existence of a fiduciary duty owed by Lazy T to the Plaintiffs was presented to the jury, the Plaintiffs have failed to satisfy the first element of their breach of fiduciary duty claim against Lazy T – the existence of a fiduciary duty owed to the Plaintiffs.

*Fiduciary Duty Allegedly Owed by Paradigm to the Plaintiffs*. Next, pursuant to Question 2, the jury was asked to determine whether Paradigm was an agent for the Plaintiffs under the Participation Agreement. An answer of "yes" would mean that Paradigm, as the Plaintiffs' agent for purposes of the Participation Agreement, would owe a fiduciary duty to the Plaintiffs in connection with the Participation Agreement. The jury answered "yes" to the question. The Defendants challenge such determination, claiming that no, or insufficient, evidence was presented at trial to enable such determination. The Plaintiffs disagree. Having considered the State Court Trial Record, the Court finds that the jury's determination is supported by legally sufficient evidence. More than a mere scintilla of evidence was presented, such that reasonable and fair-minded people could conclude that an agency relationship existed. As a result, the Plaintiffs have satisfied the first element of their breach of fiduciary claim against Paradigm.

*Fiduciary Duty Allegedly Owed by Thunderbird Land to the Plaintiffs*. Pursuant to Question 3, the jury was asked to determine whether Thunderbird Land was an agent of Paradigm in connection with the Alpine Letter Agreement. An answer of "yes" would mean that Thunderbird Land, as *Paradigm's* agent *for purposes of the Alpine Letter Agreement*, would owe

a fiduciary duty to *Paradigm* in connection with the *Alpine Letter Agreement*. Because, as indicated above, the jury's response to Question 2 established that Paradigm separately owed a fiduciary duty to the Plaintiffs, the Plaintiffs assert that the jury's answer to Question 3 – establishing that Thunderbird Land owed a fiduciary duty to Paradigm – successfully established the existence of a fiduciary duty owed by Thunderbird Land directly to the Plaintiffs. The Defendants contest the Plaintiffs' sub-agency theory, arguing that no determinations were made by the jury that would support such a conclusion. The Court agrees.

Under Texas law, an agency relationship is not one that is presumed by law; instead, the proponent of the relationship must present facts supporting its existence.[70] With this in mind, "[a]n agent is one who consents to the control of another, the principal, where the principal manifests consent that the agent shall act for the principal."[71] The instructions provided to the jury in connection with Questions 2 and 3 properly stated this standard: "An agent is one who consents to act on behalf of, and subject to, the control of the principal, who has manifested consent that the agent shall so act." With respect to the requirement of consent, "there must be a meeting of the minds in establishing the agency, and the consent of both the principal and the agent is necessary to create the agency, although such consent may be implied rather than expressed."[72] "Essential to the principal-agent relationship is the principal's right to control the acts of the alleged agent."[73]

---

[70] *See Ross v. Texas One P'ship*, 796 S.W.2d 206, 209-10 (Tex. App. – Dallas 1990), *writ denied*, 806 S.W.2d 222 (Tex. 1991).

[71] *First Nat'l Acceptance Co. v. Bishop*, 187 S.W.3d 710, 714 (Tex. App. – Corpus Christi 2006, no pet.).

[72] *Grissom v. Watson*, 704 S.W.2d 325, 326 (Tex. 1986) (quoting *First Nat'l Bank v. Farmers & Merch. State Bank*, 417 S.W.2d 317 (Tex. Civ. App. – Tyler 1967, writ ref'd n.r.e.)).

[73] *Davis-Lynch, Inc. v. Asgard Techs., LLC*, 472 S.W.3d 50, 60 (Tex. App. – Houston [14th Dist.] 2015, no pet.); *see also Bishop*, 187 S.W.3d at 714 ("The right of control is 'the supreme test' in establishing an agency relationship") (citing *State Farm Mut. Auto. Ins. Co. v. Traver*, 980 S.W.2d 625, 628 (Tex. 1998)).

In the case at hand, the jury was not asked to determine if Thunderbird Land was an agent of the Plaintiffs.  Instead, the Plaintiffs rely upon a sub-agency theory, attempting to link Thunderbird Land to the Plaintiffs through Paradigm.  "A subagent is a person appointed by an agent to perform some duty, or the whole of the business relating to his agency.  He may be the agent of the agent, or he may be the agent of the principal depending upon the agreement creating the primary agency, or upon the circumstances."[74]  Under the above-described principles of agency, in order for the sub-agent to be considered the agent of the principal, and thus owe a fiduciary duty directly to the principal, the authority of the agent to appoint a sub-agent must be proved, and there must be proof that the sub-agent and the principal understood that the sub-agent would be taking action on behalf of the principal, subject to the principal's ultimate control, and that they both expressly, or at least implicitly, consented to such arrangement.[75]

With foregoing in mind, here, the jury's determinations fail to establish the requisite linkage between Thunderbird Land and the Plaintiffs to substantiate the existence of a sub-agency relationship between Thunderbird Land and the Plaintiffs.  To understand this, it is first important to highlight the contractual relationships at issue, and to then consider the questions actually posed to the jury.  First, while Paradigm had both a contractual connection to both the Alpine Letter Agreement (as a party) and the Participation Agreement (as an agent), the Plaintiffs only had a contractual connection to the Participation Agreement.  Neither of the Plaintiffs was a party to the Alpine Letter Agreement and neither had any rights under the agreement.  With that in mind, while the jury was asked in Question 2 to determine if Paradigm was an agent of the Plaintiffs under the *Participation Agreement* (an agreement to which the Plaintiffs were parties), the jury was asked in

---

[74] *Gulf Refining Co. v. Shirley*, 99 S.W.2d 613, 615 (Tex. Civ. App. – Eastland 1936, writ dism'd) (quoting 2 Am.Jur. § 2, pp.13-14).

[75] *See, e.g., Janes v. CPR Corp.*, 623 S.W.2d 733, 740-41 (Tex. App. – Houston [1st Dist.] 1981, writ ref'd n.r.e.).

Question 3 to determine if Thunderbird Land was an agent of Paradigm in connection with the *Alpine Letter Agreement* (an agreement to which the Plaintiffs were <u>not</u> parties). Thus, given the difference in the contractual relationships referenced in Questions 2 and 3, and the fact that the Plaintiffs were not party to the Alpine Letter Agreement, it cannot logically be inferred from the jury's responses that the jury found that Thunderbird Land's service as Paradigm's agent for purposes of the *Alpine Letter Agreement* correspondingly constituted Thunderbird Land's consent to serve as the Plaintiffs' agent for purposes of the *Participation Agreement*.

The disconnect highlighted above could have been avoided by asking the jury to directly determine whether Thunderbird Land was an agent for the Plaintiffs in connection with the *Participation Agreement*, or by at least indirectly asking the jury to determine whether Thunderbird Land was an agent for Paradigm in connection with the *Participation Agreement*. That was not done, and as a result there are ramifications. It is not the court's job to supplement the jury's determinations with its own fact-finding to thereby enable a party to properly connect the dots between point A and B in a legal theory. Because the jury's findings fail to lay a sufficient factual predicate for the determination that a sub-agency relationship existed between Thunderbird Land and the Plaintiffs, and because no other predicate question with respect to the existence of a fiduciary duty owed by Thunderbird Land to the Plaintiffs was presented to the jury, the Plaintiffs have failed to satisfy the first element of their breach of fiduciary duty claim against Thunderbird Land – the existence of a fiduciary duty owed to the Plaintiffs.

## 2. *The Alleged Breaches of Fiduciary Duty*

Turning to the question of breach, the Plaintiffs divided the questions into two categories in relation to the Initial 30,000 acres: (a) whether Lazy T and/or Paradigm breached their alleged fiduciary duties to the Plaintiffs in calculating and distributing proceeds from the sale of the Initial

30,000 acres (the "Part A" questions); and (b) whether Thunderbird Land breach its alleged fiduciary duties to the Plaintiffs in charging expenses to the project (the "Part B" questions). In the case of Lazy T and Thunderbird Land, because the Plaintiffs failed to establish the existence of a fiduciary duty owed by either of them to the Plaintiffs, it is unnecessary to consider the jury's findings with respect to breach and those findings will be disregarded.

With respect to Paradigm, pursuant to Question 7, the jury was asked to determine whether Paradigm complied with its fiduciary duties to the Plaintiffs in the calculation and distribution of the proceeds from the sale to Devon of the Initial 30,000 Acres. The jury instructions accompanying Question 7 made clear that the question was predicated upon Paradigm owing fiduciary duties of care and loyalty to the Plaintiffs as their agent. The jury answered "no" to the question, finding that Paradigm had breached its fiduciary duties to the Plaintiffs. While the Defendants challenge such determination, again claiming that no, or insufficient, evidence was presented at trial to enable such determination, having considered the State Court Trial Record, the Court finds that the determination was supported by legally sufficient evidence enabling reasonable and fair-minded people to conclude that a breach occurred. As a result, the Plaintiffs have satisfied the second element of their breach of fiduciary claim against Paradigm.

### 3.    *The Alleged Damages Caused by the Breaches*

In the case of causation and damages, once again the Court confines its analysis to Paradigm, given the lack of any fiduciary duties owed by Lazy T or Thunderbird Land to the Plaintiffs. With respect to Paradigm, pursuant to Question 10 (Part A), the jury was asked to determine the amount of damages proximately caused by the breaches of fiduciary duty found in response to Question 7. Pursuant to Question 7, the jury was asked to determine whether Lazy T and/or Paradigm breached their fiduciary duties to the Plaintiffs. While the jury found in response

to Question 7 that both Lazy T and Paradigm had breached their fiduciary duties to the Plaintiffs,

the jury's answer in relation to Lazy T must be disregarded for the reasons previously discussed.

This causes Question 10 (Part A) to be problematic because it presented a single damages question

to the jury instead of requesting individualized damages determinations on account of Lazy T's

alleged breach and Paradigm's alleged breach.  In response to the single question presented, the

jury responded that both Trek and Tiburon suffered damages in the amount of $444,875.

Given the submission of a single broad-form liability question, the Defendants assert that

the jury's determination must be disregarded because the jury could have theoretically based its

determination solely on its finding of a breach by Lazy T.  As explained by the Texas Supreme

Court in *Crown Life Ins. Co. v. Casteel*, "[w]hen a single broad-form liability question erroneously

commingles valid and invalid liability theories and the appellant's objection is timely and specific,

the error is harmful when it cannot be determined whether the improperly submitted theories

formed the sole basis for the jury's finding."[76]

Importantly, the Texas Supreme Court was careful in *Casteel* to specify that the error in

submitting an invalid broad-form liability question to the jury will only be considered *harmful* if

the complaining party has timely objected to it, specifying the problem with the form of the

question so that it can be fixed before submission to the jury.[77]  This requirement is embodied

within Rule 274 of the Texas Rules of Civil Procedure, which provides in pertinent part:

> A party objecting to a charge must point out distinctly the objectionable matter and
> the grounds of the objection.  Any complaint as to a question, definition, or
> instruction, on account of any defect, omission, or fault in pleading, is waived
> unless specifically included in the objections.[78]

---

[76] 22 S.W.3d 378, 389 (Tex. 2000).

[77] *See In re C.O.S.*, 988 S.W.2d 760, 765 (Tex. 1999); *see also State Dep't of Highways & Pub. Transp. v. Payne*, 838 S.W.2d 235, 241 (Tex. 1992).

[78] Tex. R. Civ. P. 274.

With respect to timeliness, Rule 272 of the Texas Rules of Civil Procedure requires that objections to the charge be presented to the court before the charge is read to the jury, and that all objections not so presented shall be considered waived.[79]  Thus, even in the case of a defective broad-form liability question, the objection will be deemed waived if not presented to the court by such time.[80]

With the foregoing in mind, the Defendants failed to timely and specifically object to Question 10 (Part A) on the basis that it was a single broad-form liability question that could prove to be problematic in the event that, as here, one of the grounds for liability is later determined to be invalid.[81]  Therefore, the Defendants' *Casteel*-based challenge to Question 10 (Part A) is deemed waived.

That said, there are still additional considerations to be taken into account in determining the amount of Paradigm's liability for the damages determined by the jury.  In particular, because breach of fiduciary duty is a type of tort claim to which chapter 33 of the Texas Civil Practice & Remedies Code (the "**TCPRC**") applies,[82] chapter 33's proportionate responsibility limitations must also be factored into the equation.  In this regard, TCPRC § 33.013(a) provides that "a liable defendant is liable to a claimant only for the percentage of the damages found by the trier of fact equal to that defendant's percentage of responsibility with respect to the personal injury, property damage, death, or other harm for which the damages are allowed."[83]

---

[79] *See* Tex. R. Civ. P. 272; *see also King Fisher Marine Serv., LP v. Tamez*, 443 S.W.3d 838, 842-44 (Tex. 2014).

[80] *See In re B.L.D. & B.R.D.*, 113 S.W.3d 340, 349-50 (Tex. 2003), *cert. denied sub nom. Dossey v. Texas Dep't of Protective & Reg. Servs.*, 541 U.S. 945 (2004).

[81] *See* State Court Clerk's Record, Docket No. 50-28, at pp.28-65 (Plaintiffs' proposed jury charge) and pp.67-85 (Defendants' objections thereto); State Court Trial Record, Docket No. 41-25, at pp.6-13 (portion of jury charge conference with State Court in which Defendants' objections presented and determined).

[82] *See* Tex. Civ. Prac. & Rem. Code § 33.002(a)(1).

[83] Tex. Civ. Prac. & Rem. Code § 33.013(a).

With that in mind, pursuant to Question 11 (Part A), the jury was asked to determine for each party that it found caused or contributed to cause the damages found in response to Question 10 (Part A) the percentage of responsibility attributable to each.  In response to the question, the jury found Lazy T responsible for 100% of the Question 10 (Part A) damages.  TCPRC § 33.013(b) further provides, however, that a liable defendant may nevertheless be found to be jointly and severally liable for the full amount of recoverable damages under TCPRC § 33.012[84] if either (a) the defendant's percentage of liability was determined to be greater than 50%, or (b) the defendant, with the specific intent to do harm to others, acted in concert with another person to engage in conduct described in Texas Penal Code provisions specified in TCPRC § 33.013(b)(2) (as applicable to this case, the cross-referenced Texas Penal Code provisions include provisions applicable to the misapplication of fiduciary property and certain types of theft (hereafter referred to as the "**Applicable TPC Provisions**")).[85]  That said, the Plaintiffs failed to obtain a finding that either of the TCPRC § 33.013(b) exceptions apply.

First, in finding Lazy T to be responsible for 100% of the Question 10 (Part A) damages, the jury implicitly found Paradigm to be 0% responsible, eliminating the first possible exception.  Second, while Question 13.2 presented the jury with a question relating to the Applicable TPC Provisions, the jury was not asked to determine if *Paradigm* had acted in concert with others to engage in any conduct described in the Applicable TPC Provisions or if *Paradigm* had done so with the specific intent to do harm to others.  The jury was only asked about other defendant parties, thereby eliminating the second possible exception.  Thus, given the lack of any jury

---

[84] TCPRC § 33.012 imposes certain limits on the amount of the damages that the plaintiff may recover.  Of particular relevance to this case, TCPRC § 33.012(b) provides that "[i]f the claimant has settled with one or more persons, the court shall … reduce the amount of damages to be recovered by the claimant with respect to a cause of action by the sum of the dollar amounts of all settlements."  Tex. Civ. Prac. & Rem. Code § 33.012(b).

[85] *See* Tex. Civ. Prac. & Rem. Code § 33.013(b)(2)(J) & (M).

findings that would support application of a TCPRC § 33.013(b) exception to Paradigm, none of the Question 10 (Part A) damages are recoverable against Paradigm.

### 4.    *The Derivative Concert of Action and Conspiracy Claims*

Both concert of action and conspiracy are theories of derivate liability under Texas law.[86] They are not independent causes of action, but rather a legal means (sometimes referred to as a "claim") by which a party may be found to be vicariously liable for the tortious conduct of another and the damages caused thereby. As such, liability is entirely dependent upon the existence of an injury caused by the underlying tort, not by the conspiracy or concert of action itself.[87]

Under Texas law, to establish a right to recover under civil conspiracy, a plaintiff must establish the following five elements: (1) two or more persons; (2) an object to be accomplished; (3) a meeting of minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages proximately caused by the unlawful, overt act(s).[88] Under Texas law, to establish a right to recover under concert of action, a plaintiff must show: (1) a breach of a duty by another; (2) damages proximately caused by the breach; (3) the defendant's knowledge that the other's conduct constitutes a breach of duty; and (4) the defendant's substantial assistance or encouragement to the other to so conduct himself.[89]

### a.    *Alleged Concert of Action Liability*

Pursuant to Question 9 (Part A), the jury was asked to determine if the Defendants "knowingly participate[d]" in Lazy T's and/or Paradigm's breach of fiduciary duty to the

---

[86] *See Agar Corp., Inc. v. Electro Circuits Int'l, LLC*, 580 S.W.3d 136, 140-43 & n.2 (Tex. 2019) (discussing the nature of civil conspiracy, and describing concert of action as a separate theory of vicarious liability); *Juhl v. Airington*, 936 S.W.2d 640, 643-45 (Tex. 1996) (discussing the nature of concert of action).

[87] *See Agar Corp.*, 580 S.W.3d at 140-41.

[88] *Id.* at 141 (citing *Massey v. Armco Steel Co.*, 652 S.W.2d 932, 934 (Tex. 1983)).

[89] *See Juhl*, 936 S.W.2d at 643.

Plaintiffs.[90]  Separately, pursuant to Question 9 (Part B), the jury was asked to determine if the Defendants "knowingly participate[d]" in Thunderbird Land's breach of fiduciary duty to the Plaintiffs.  These questions go to the issue of concert of action liability.  While the jury answered "yes" with respect to each of the Defendants in both Part A and Part B, such answers are irrelevant. Because there are no damages recoverable by the Plaintiffs against Lazy T, Paradigm, or Thunderbird Land for breach of any fiduciary duty in relation to the Initial 30,000 Acres, there are no damages recoverable against any of the Defendants based upon the derivative liability theory of concert of action.

### b.   *Alleged Conspiracy Liability*

Pursuant to Question 12 (Part A), the jury was asked to determine if any of the following parties – Stephens, Thunderbird Oil, Thunderbird Land, Thunderbird Resources, and Carroll – were part of a conspiracy that resulted in the damages found in response to Question 10 (Part A) (*i.e.*, for Lazy T's breach of fiduciary duty to the Plaintiffs and/or Paradigm's breach of fiduciary duty to the Plaintiffs).  Separately, pursuant to Question 12 (Part B), the jury was asked to determine if any of the following parties – Stephens, Thunderbird Oil, Thunderbird Land, Thunderbird Resources, and Carroll – were part of a conspiracy that resulted in the damages found in response to Question 10 (Part B) (*i.e.*, for Thunderbird Land's breach of fiduciary duty to the Plaintiffs).  In conjunction with such questions, the jury was given an instruction on what it takes to be part of a conspiracy.

In each case, the jury responded "yes" as to Stephens and Thunderbird Land, but "no" as to Thunderbird Oil and Thunderbird Resources.  Based upon the jury's response, neither

---

[90] While there is a *Casteel* problem with respect to Question 9 (Part A), no clearly articulated objection to the question on such basis was timely lodged.

Thunderbird Oil nor Thunderbird Resources can be held liable for any breach of fiduciary duty damages related to the Initial 30,000 Acres on the basis of derivative conspiracy liability.

In the case of Stephens, while the jury answered "yes," such answers are irrelevant for two reasons. First, because there are no damages recoverable by the Plaintiffs against Lazy T, Paradigm, or Thunderbird Land for breach of any fiduciary duty in relation to the Initial 30,000 Acres, there are no damages recoverable against Stephens based upon the derivative liability theory of conspiracy. Second, even if certain damages had been found to be recoverable against Paradigm, the conspiracy claim against Stephens would fail because the jury did not find Paradigm to be a co-conspirator. In order for conspiracy liability to attach, there must be a finding that the targeted conspirator and the defendant found to be liable conspired with one another to accomplish the unlawful objective of the conspiracy. Here, the jury did not find that Stephens and Paradigm conspired with one another; it found that Stephens conspired with others, which fails to provide the necessary linkage for Stephens to be found liable for any damages awarded against Paradigm.

For these reasons, there are no damages recoverable against any of the Defendants based upon the derivative liability theory of conspiracy.

### c.    *Alleged Liability for Exemplary Damages*

Finally, pursuant to Questions 13, 13.1, and 13.2, the jury was presented with a number of exemplary damages questions. Among other things, the jury determined that an award of $2.5 million in exemplary damages should be assessed against Stephens in relation to the Group 1 Claims. The Plaintiffs request that such damages be awarded to them. Stephens disputes the Plaintiffs' right to such an award on multiple grounds. Ultimately, Stephens is correct for the very simple reason that TCPRC § 41.004(a) provides that "exemplary damages may be awarded only

if damages other than nominal damages are awarded,"[91] and here no legally viable damages on account of any of the Group 1 Claims are awardable against Stephens.

**B.**     *The Group 2 Claims Involving the Acquisition and Sale of the Additional Acreage*

Next, with respect to the Additional Acreage claims and causes of action, while in the Final Petition the Plaintiffs included each of the Defendants as a direct defendant party target of the Plaintiffs' breach of fiduciary duty claim involving the acquisition and sale of the Additional Acreage, the jury was only presented with questions as to Thunderbird Oil.[92]  The jury was also asked to determine whether Lazy T, Paradigm, Thunderbird Land, and Carroll breached their alleged fiduciary duties to the Plaintiffs.  The Plaintiffs seek to hold each of the Defendants liable under the derivative claims of concert of action and conspiracy, predicated upon the breach of fiduciary duty determinations made in relation to Thunderbird Oil, Lazy T, Paradigm, Thunderbird Land, and Carroll.  Each of the claims against the Defendants are addressed below.

**1.**     *The Alleged Fiduciary Duties Owed to the Plaintiffs*

Pursuant to Question 14, the jury was asked to determine whether each of Thunderbird Oil, Lazy T, Paradigm, Thunderbird Land, and Carroll breached their fiduciary duties to the Plaintiffs with respect to the acquisition and sale of the Additional Acreage.  As a predicate to the question, the jury was instructed to consider its prior responses to duty-based questions.  Thus, because the instructions to Question 14 provide a guide with respect to the factual bases relied upon by the Plaintiffs for the existence of fiduciary duties owed to the Plaintiffs, they are discussed below in determining whether the first element of the Plaintiffs' breach of fiduciary claim (*i.e.*, the existence of a fiduciary duty) has been satisfied in relation the acquisition and sale of the Additional Acreage.

---

[91] Tex. Civ. Prac. & Rem. Code § 41.004(a).

[92] The failure to submit questions to the jury with respect to Stephens' and Thunderbird Resources' alleged breach of fiduciary duty constituted a waiver of the claim against such Defendants.  *See Cosgrove*, 774 S.W.2d at 666.

*Fiduciary Duty Allegedly Owed by Thunderbird Oil to the Plaintiffs*.  First, with respect to Thunderbird Oil, the jury was instructed to answer Question 14 only if the jury had answered "yes" to both Question 1 *and* either Question 5B or Question 6.  As previously discussed, Question 1 presented the question of whether Three Finger was a partnership.  While the jury answered "yes" to such question, the Texas Appellate Court determined that the Participation Agreement did not cause Three Finger to be validly established as a partnership.  Therefore, the jury's answer to Question 1 must be disregarded.  Questions 5B and 6 simply asked the jury to determine if Thunderbird Oil was a party to the Participation Agreement.[93]  While the jury also answered "yes" to both of those questions, the answers are irrelevant given that the Participation Agreement did not create a partnership.  Because no other predicate question with respect to the existence of a fiduciary duty owed by Thunderbird Oil to the Plaintiffs was presented to the jury, the Plaintiffs have failed to satisfy the first element of their breach of fiduciary duty claim against Thunderbird Oil – the existence of a fiduciary duty owed to the Plaintiffs.

*Fiduciary Duty Allegedly Owed by Lazy T to the Plaintiffs*.  Next, with respect to Lazy T, the jury was instructed to answer Question 14 only if the jury had answered "yes" to Question 1.  Thus, the basis for the fiduciary duty claimed to be owed by Lazy T in relation to the Additional

---

[93] Pursuant to Questions 4, 5A, and 5B, the jury was asked to determine if Carroll had signed the Participation Agreement, if the Alpine Group was a partnership, and if Carroll's signing of the Participation Agreement was for the purpose of carrying on, in the ordinary course, business of the kind carried on by the Alpine Group.  An answer of "yes" to all of these questions was designed to establish that Carroll's execution of the Participation Agreement was sufficient to bind all other members of the Alpine Group, including Thunderbird Oil, to the Participation Agreement as Carroll's partners.  The Texas Appellate Court ruled, however, that the Alpine Group did not constitute a validly established partnership; therefore, the jury's answer to Question 5A (whether the Alpine Group was a partnership) must be disregarded, and the jury's answers to Questions 4 and 5B are insufficient to establish that the Alpine Group was a party to the Participation Agreement.  Separately, pursuant to Question 6, the jury was asked to determine whether Thunderbird Oil had ratified the Alpine Group's entry into the Participation Agreement.  The jury answered "yes" to the question.  While the predicate to such question (*i.e.*, that the Alpine Group had entered into the Participation Agreement) is arguably faulty for the reasons discussed above, ostensibly in answering "yes," the jury determined that Thunderbird Oil was nevertheless bound to the Participation Agreement by virtue of ratification.  Even so, because the Texas Appellate Court found that the Participation Agreement did not create a partnership, the finding is irrelevant to the existence of a fiduciary duty owed by Thunderbird Oil.

Acreage is the same as in relation to the Initial 30,000 Acres.  Consequently, for the same reasons that the Plaintiffs have failed to satisfy the first element of their breach of fiduciary duty claim against Lazy T in relation to the Initial 30,000 Acres, the Plaintiffs have also failed to satisfy the first element of their breach of fiduciary duty claim against Lazy T in relation to the Additional Acreage.

*Fiduciary Duty Allegedly Owed by Paradigm to the Plaintiffs*.  Third, with respect to Paradigm, the jury was instructed to answer Question 14 only if the jury had answered "yes" to Question 2.  As noted earlier, Question 2 asked the jury to determine if Paradigm was an agent for the Plaintiffs under the Participation Agreement.  The jury answered "yes" to the question.  As previously indicated, the Defendants challenge such determination, claiming that no, or insufficient, evidence was presented at trial to enable such determination.  The Plaintiffs disagree. Having considered the State Court Trial Record, the Court finds that the jury's determination is supported by legally sufficient evidence.  More than a mere scintilla of evidence was presented, such that reasonable and fair-minded people could conclude that an agency relationship existed. As a result, the Plaintiffs have satisfied the first element of their breach of fiduciary claim against Paradigm in relation to the Additional Acreage.

*Fiduciary Duty Allegedly Owed by Thunderbird Land to the Plaintiffs*.  Next, with respect to Thunderbird Land, the jury was instructed to answer Question 14 only if the jury had answered "yes" to Question 3.  Thus, the basis for the fiduciary duty claimed to be owed by Thunderbird Land in relation to the Additional Acreage is the same as in relation to the Initial 30,000 Acres. Consequently, for the same reasons that the Plaintiffs have failed to satisfy the first element of their breach of fiduciary duty claim against Thunderbird Land in relation to the Initial 30,000

Acres, the Plaintiffs have also failed to satisfy the first element of their breach of fiduciary duty claim against Thunderbird Land in relation to the Additional Acreage.

_Fiduciary Duty Allegedly Owed by Carroll to the Plaintiffs_.   Finally, with respect to Carroll, the jury was instructed to answer Question 14 only if the jury had answered "yes" to both Question 1 _and_ either Question 4 or Question 6.   The analysis with respect to Carroll is similar to the analysis with respect to Thunderbird Oil.   First, based upon the Texas Appellate Court's determination that a partnership (Three Finger) was not validly created by the Participation Agreement, the jury's answer to Question 1 must be disregarded.   Questions 4 and 6 simply asked the jury to determine if Carroll was a party to the Participation Agreement.[94]   While the jury answered "yes" to both of those questions, the answers are irrelevant because, based upon the Appellate Ruling, the parties to the Participation Agreement did not owe a fiduciary duty to one another on account of being a party to the agreement.   Because no other predicate question with respect to the existence of a fiduciary duty owed by Carroll to the Plaintiffs was presented to the jury, the Plaintiffs have failed to satisfy the first element of their breach of fiduciary duty claim against Carroll.

### 2.   *The Alleged Breaches of Fiduciary Duty*

As indicated above, pursuant to Question 14, the jury was asked to determine if each of Thunderbird Oil, Lazy T, Paradigm, Thunderbird Land, and Carroll complied with their fiduciary duties to the Plaintiffs with respect to the acquisition and sale of the Additional Acreage.   While the jury answered the question with respect to each of these parties, their answers with respect to Thunderbird Oil, Lazy T, Thunderbird Land, and Carroll must be disregarded because none of these defendants owed a fiduciary duty to the Plaintiffs, as detailed above.

---

[94] *See* footnote 97, *supra*.

As for the remaining party, Paradigm, the jury answered "no," meaning that the jury found that Paradigm had breached its fiduciary duties to the Plaintiffs. While the Defendants challenge such determination, claiming that no, or insufficient, evidence was presented at trial to enable such determination, having considered the State Court Trial Record, the Court finds that the determination was supported by legally sufficient evidence enabling reasonable and fair-minded people to conclude that a breach occurred. As a result, the Plaintiffs have satisfied the second element of their breach of fiduciary claim against Paradigm.

### 3.      *The Alleged Damages Caused by the Breaches*

Pursuant to Question 17, the jury was requested to determine "[w]hat sum of money, if paid now in cash, would fairly and reasonably compensate the Plaintiffs for their damages, if any, proximately caused by not receiving proceeds from the sale of the Additional Acreage." In response, the jury found damages of $886,900 for each of Tiburon and Trek.

Unfortunately, the jury's response to Question 17 is tainted by the form of the question presented. First, instead of requesting the jury to determine the damages *caused by Paradigm's breach*, it asked for the damages *caused by not receiving proceeds from the sale of the Additional Acreage – i.e.*, damages that could have been caused by a variety of wrongdoing unrelated to Paradigm's breach. One of the complicating factors present here, for example, is the fact that the instructions accompanying Question 17 directed the jury to answer the question if it had answered "no" to *any part* of Question 14 *or* "yes" to *any part* of Question 15 (wherein the jury was asked to determine if certain parties (other than Paradigm) had intentionally interfered with the Plaintiffs' rights under the Participation Agreement). Because the jury answered "yes" as to multiple parties other than Paradigm identified in Question 14 and answered "yes" as to multiple parties other than Paradigm identified in Question 15, it is unclear whether the jury's determination in response to

Question 17 was on account of Paradigm's actions, the actions of one or more of the other parties listed in Questions 14 and 15, or some combination thereof.

These problems should have been brought to the State Court's attention before the charge was submitted to the jury. Because neither the Plaintiffs nor the Defendants did so, any objection to the form of the question was waived. Hence, that leaves the Court with the unenviable task of attempting discern what the jury concluded.

In that regard, first, based upon the State Court Trial Record, the Court finds that the jury could have reasonably found that each of Tiburon and Trek suffered damages of $886,900 "caused by not receiving proceeds from the sale of the Additional Acreage." But that begs the question of *which party(ies)* was (were) responsible for causing the Plaintiffs to not receive such proceeds. Given the form of the question presented to the jury in Question 17, the jury's response thereto neither expressly nor implicitly finds that the damages were caused by Paradigm's breach of fiduciary duty. Hence, the Court is forced to look elsewhere within the Jury Verdict for an answer to that question. That takes the Court to Question 18, wherein the jury was asked the following: "For each party you found caused or contributed to cause the damages you found in response to Question No. 17, find the percentage of responsibility attributable to each." Paradigm was included among the list of potentially responsible parties. Significantly, the jury found that Paradigm was not responsible for any of the Question 17 damages. Thus, because no other questions were presented to the jury that ostensibly bear upon the question of whether the Question 17 damages were caused by Paradigm's breach of fiduciary duty, the Plaintiffs have failed to satisfy the third element of their breach of fiduciary duty claim against Paradigm – causation.

### 4.    *The Derivative Concert of Action and Conspiracy Claims*

### a.    *Alleged Concert of Action Liability*

Pursuant to Question 20, the jury was asked to determine if the Defendants "act[ed] through 'concerted action' to exclude the Plaintiffs from the Additional Acreage."  The jury responded "yes" as to Stephens, but "no" as to Thunderbird Oil and Thunderbird Resources.  Based upon the jury's response, neither Thunderbird Oil nor Thunderbird Resources can be held liable for any breach of fiduciary duty damages related to the Additional Acreage on the basis of derivative concert of action liability.  In the case of Stephens, while the jury answered "yes," the answer is irrelevant because there are no damages recoverable by the Plaintiffs against Thunderbird Oil, Lazy T, Paradigm, Thunderbird Land, or Carroll for breach of any fiduciary duty in relation to the Additional Acreage.[95]  For these reasons, there are no damages recoverable against any of the Defendants based upon the derivative liability theory of concert of action.

### b.    *Alleged Conspiracy Liability*

Pursuant to Question 19, the jury was asked to determine if any of the following parties – Stephens, Thunderbird Oil, Thunderbird Land, Thunderbird Resources, and Carroll – were part of a conspiracy that resulted in the damages found in response to Question 17.  The jury responded "yes" as to Stephens, but "no" as to Thunderbird Oil and Thunderbird Resources.  Based upon the jury's response, neither Thunderbird Oil nor Thunderbird Resources can be held liable for any

---

[95] The Court notes that, had there been any recoverable damages for breach of fiduciary duty, the Plaintiffs would still not be entitled to a judgment against Stephens on the basis of concert of action liability.  Instead, a new trial would be required with respect to the claim because the jury's answer to Question 20 in relation to Stephens (taking into account the "concert action liability" definition provided to the jury in connection therewith) fatally conflicts with the jury's answer to Question 16 in relation to Stephens (finding that Stephens had a good faith belief that all participants under the Participation Agreement (which includes both of the Plaintiffs) had terminated their rights thereunder).  *See Ford Motor Co. v. Miles*, 141 S.W.3d 309, 314-15 (Tex. App. – Dallas 2004, pet. denied).

breach of fiduciary duty damages related to the Additional Acreage on the basis of derivative conspiracy liability.

In the case of Stephens, while the jury answered "yes," the answer is irrelevant for two reasons. First, because there are no damages recoverable by the Plaintiffs against Thunderbird Oil, Lazy T, Paradigm, Thunderbird Land, or Carroll for breach of any fiduciary duty in relation to the Additional Acreage, there are no damages recoverable against Stephens based upon the derivative liability theory of conspiracy. Second, even if certain damages had been found to be recoverable against Paradigm, the conspiracy claim against Stephens would fail because the jury did not find Paradigm to be a co-conspirator. In order for conspiracy liability to attach, there must be a finding that the targeted conspirator and the defendant found to be liable conspired with one another to accomplish the unlawful objective of the conspiracy. Here, the jury did not find that Stephens and Paradigm conspired with one another; it found that Stephens conspired with others, which fails to provide the necessary linkage for Stephens to be found liable for any damages awarded against Paradigm.

For these reasons, there are no damages recoverable against any of the Defendants based upon the derivative liability theory of conspiracy.

### c.    *Alleged Liability for Exemplary Damages*

Finally, pursuant to Questions 23, 23.1, and 23.2, the jury was presented with a number of exemplary damages questions. Among other things, the jury determined that an award of $5.0 million in exemplary damages should be assessed against Stephens in relation to the Group 2 Claims. The Plaintiffs request that such damages be awarded to them under the new judgment. Stephens disputes the Plaintiffs' right to such an award on multiple grounds. Ultimately, Stephens is correct for the very simple reason that TCPRC § 41.004(a) provides that "exemplary damages

may be awarded only if damages other than nominal damages are awarded,"[96] and here no legally

viable damages on account of any of the Group 2 Claims are awardable against Stephens.

### *CONCLUSION*

For all of the foregoing reasons, the Court will deny the Plaintiffs' Motion for Judgment,

grant in part, and deny in part, the Defendants' JNOV Motion, and enter judgment that Plaintiffs

take nothing from the Defendants in this action.  A final judgment in accordance herewith will be

separately entered by the Court.

### # # #   END OF MEMORANDUM OPINION   # # #

---

[96] Tex. Civ. Prac. & Rem. Code § 41.004(a).